UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| RODNEY BURCH,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>CITY OF CHUBBUCK, a political subdivision of the State of Idaho; and KEVIN B. ENGLAND, in his official and individual capacity,<br><br>　　　　Defendants. | Case No. 4:22-cv-00366-AKB<br><br>**MEMORANDUM DECISION AND ORDER** |

Pending before the Court is Defendants' Motion for Summary Judgment (Dkt. 19) and Motion to Strike (Dkt. 21). The Court heard oral argument on the motions on April 25, 2024. For the reasons set forth below, the Court grants the summary judgment motion and denies the motion to strike as moot.

## I.  BACKGROUND

Plaintiff Rodney Burch filed this action under 42 U.S.C. § 1983 against his former employer, Defendant City of Chubbuck, and the Chubbuck Mayor, Defendant Kevin England. In 2015, Mayor England appointed Burch to be the City's Public Works Director,[1] a position which Burch held until his resignation in April 2022. (Dkt. 20-1 at ¶ 2; Dkt. 19-4 at p. 16). As the Public Works Director, Burch was the head of the City's Public Works Department, and according to his job description, he was responsible for administering and managing the City's street maintenance, water and wastewater, sanitation, parks and recreation, engineering, building inspections, planning

---

[1]　Under the City's municipal code, there are six appointive officers, including the Public Works Director. *See* City Code of Chubbuck, Idaho § 2.10.010. The Mayor appoints officers with the City Council's consent. *Id.*; *see also* Idaho Code § 50-204.

**MEMORANDUM DECISION AND ORDER - 1**

and economic development, and the City garage. (Dkt. 19-4 at p. 20). Burch also supervised several managers within the Public Works Department, who in turn supervised over forty City employees. (*Id.* at 18; Dkt. 20-1 at ¶ 3). Burch was one of the City's six appointed officers who reported directly to Mayor England, and according to his job description, he worked under the direction of both Mayor England and the City Council. (Dkt. 20-1 at ¶ 3; Dkt. 19-4 at pp. 18, 20).

For much of Burch's tenure as the Public Works Director, he and Mayor England had a good working relationship. (Dkt. 20-1 at ¶ 5; Dkt. 19-2 at ¶ 3). During Burch's first six years with the City, Burch often communicated his concerns regarding City management and his work to Mayor England with no issues. Notably, in 2018, Burch expressed concerns to Mayor England that, in his view, certain accounting and operational practices of the City were a waste of public funds. (Dkt. 20-3 at 166:1-172:20). Among other things, Burch believed the City misallocated expenses across its departments and had an inefficient system for authorizing work orders. (*Id.*).

Based on these and other concerns, Burch and the Public Works Department developed a Strategic Plan for the City, and the City Council adopted this Plan for Mayor England to implement. (Dkt. 20-13 at ¶ 13). During this time, Burch also expressed concerns to Mayor England about Burch's workload, and in 2020, Burch requested Mayor England's help in managing some of his work duties. (Dkt. 20-1 at ¶ 6). Related to this request, Burch provided a summary of his responsibilities to Mayor England, and according to that summary, Burch's workload equated to approximately 2.5 full-time equivalent positions. (*Id.*; Dkt. 19-4 at p. 32).

 In 2021, Burch's relationship with Mayor England began to change. Around that time, Burch began advocating to change the City's organizational structure to adopt a city administrator position because Burch believed Mayor England had failed to exercise proper oversight of the City's government. (Dkt. 20-1 at ¶ 8; Dkt. 20-13 at ¶ 6). Specifically, Burch believed the Strategic

Plan had withered and died under Mayor England's supervision. (Dkt. 20-1 at ¶ 16). Burch was also concerned about Mayor England's approach to budgeting and the adoption of an online utility bill-pay credit program (credit program), which decreased City revenue.[2] (*Id.*). In Burch's view, a city administrator would ensure better oversight of the City's operations, prevent the City from wasting funds and manpower, guarantee smooth transitions between mayors, and ultimately allow Mayor England to be more successful. (*Id.* at ¶ 8; Dkt. 20-13 at ¶ 7).

In early 2021, Burch began discussing alternative organizational structures for the City with Mayor England and the Human Resources (HR) Director, Scott Gummersall. (Dkt. 20-1 at ¶ 7). In April 2021, Burch sent a letter to Mayor England formally recommending the City change its organizational structure to include a new position, i.e., a city administrator. (Dkt. 19-4 at p. 30). According to Burch, Mayor England initially supported the idea and requested Burch provide more information about the proposal. (*Id.* at ¶ 9; Dkt. 20-13 at ¶ 9). Burch also discussed the idea of a city administrator with members of the City Council, and some of the members supported the idea. (Dkt. 20-1 at ¶ 13; Dkt. 20-13 at ¶ 8).

On June 1, 2021, Burch sent a memorandum to Mayor England with several documents attached, detailing his proposal for adding a city administrator. (Dkt. 20-15 at p. 2). At least one of these documents contained Burch's criticisms of Mayor England's performance as mayor, including that Mayor England "[l]acked commitment to follow through or monitor important operational items"; was "[u]nable or unwilling to hold staff accountable"; had "[n]o clear/committed vision"; "publicly [took] credit" for issues he did not handle; and had "perception" problems including spending time on social media instead of working and not being trusted to

---

[2]     The online utility bill-pay credit program offered a five-dollar discount for residents who authorized the City to automatically deduct payment for their utility bills from their bank accounts. (Dkt. 20-13 at ¶ 15).

"objectively address issues." (*Id.* at 3-4). The document also contained positive and negative feedback regarding Mayor England "from [the] general staff." (*Id.* at 5-6). These criticisms included that Mayor England "[a]ctively discourage[ed] teamwork"; was "unaware of the actual problems"; was subject to the City's Treasurer's "incredible influence over him"; and was unaware of the "toxic work environment" at the City. (*Id.* at 5).

After sending this information to Mayor England, Burch then met with Mayor England to discuss the proposal and to communicate his ongoing concerns regarding Mayor England's implementation of the City's Strategic Plan, budgeting, and the credit program. (Dkt. 20-13 at ¶¶ 12-16). Shortly thereafter, in June 2021, Mayor England told Burch he no longer supported Burch's proposal to hire a city administrator and asked Burch to stop promoting it. (Dkt. 20-1 at ¶ 11). Mayor England also met with the City Council in June 2021 to discuss the city administrator proposal after City Councilor Melanie Evans asked Mayor England to reconsider his opposition to the proposal. (Dkt. 20-9 at pp. 1-9). Mayor England refused to change his mind, however, and the proposal ultimately died. (Dkt. 20-4 at 33:3-34:3). Around this time, Burch noticed Mayor England's attitude toward him began to "cool," and Mayor England began cutting Burch out of meetings and decisions of the type in which Burch had previously been included. (Dkt. 20-13 at ¶ 17).

As a result of Mayor England's opposition to the city administrator proposal, City Councilor Dan Heiner decided to run for mayor against Mayor England. (Dkt. 20-4 at 33:3-34:3). Burch decided to support Heiner's candidacy for mayor and placed a campaign sign supporting Heiner in his yard. (Dkt. 20-3 at 99:19-24). Mayor England learned Burch supported Heiner's candidacy sometime before the election after one of Burch's neighbors called Mayor England and told him about the sign in Burch's yard. (Dkt. 19-3, Ex. B at 24:7-25:4). Burch and Mayor England

never discussed Burch's support for Heiner, however, and Burch did not otherwise openly campaign for Heiner. (*Id.*; Dkt. 19-3, Ex. A at 99:25-100:7).

Mayor England ultimately won reelection on November 2, 2021. (Dkt. 19-2 at ¶ 10). After the election, Mayor England met with Gummersall to discuss whether he could ask Burch to resign. (Dkt. 20-7 at 10:4-24). Gummersall asked why Mayor England wanted Burch to resign, and Mayor England responded he no longer trusted Burch. (*Id.*) Gummersall and Mayor England met again later that week, and Mayor England explained his distrust of Burch related to Burch's city administrator proposal, and Mayor England expressed concern others were trying to remove him from office. (*Id.* at 11:8-18).

That same week, on November 5, 2021, Mayor England met with Burch alone to discuss their working relationship going forward. (Dkt. 19-2 at ¶ 11; Dkt. 19-3, Ex. A at 100:8-13). According to Burch, Mayor England asked him to resign because Mayor England said he no longer had confidence in Burch, although Mayor England acknowledged Burch had done nothing to warrant his resignation.[3] (Dkt. 19-3, Ex. A at 100:14-25). Burch told Mayor England he would take the weekend to think about resigning. (*Id.*) Later that day, one of Burch's employees in the Public Works Department informed Burch that Mayor England had asked him to serve as the interim Director if Burch resigned. (Dkt. 20-1 at ¶ 22).

When Burch returned to work the following week, on November 8, 2021, he informed Mayor England that he did not want to resign. (*Id.* at ¶ 23). Mayor England asked Burch to reconsider his decision, but Burch again refused. (*Id.* at ¶ 24). During this conversation, Mayor England mentioned he was surprised Burch had not defended the decision to build a new city hall

---

[3]     Mayor England disputes he asked Burch to resign during the meeting, testifying that instead it was Burch who implied he should be removed from his position. (Dkt. 19-3, Ex. B at 39:12-42:11). The Court resolves this factual dispute in favor of Burch as the nonmoving party.

to Heiner, who Mayor England referred to as "[Burch's] candidate." (*Id.* at ¶ 25). After this conversation, Mayor England scheduled a meeting with the City Council to propose removing Burch as Public Works Director. [4] (Dkt. 19-2 at ¶ 15). The City Council met to discuss Burch's removal on November 10, and during this meeting, Mayor England told the City Council he did not think he and Burch could work together. (*Id.* at ¶ 16; Dkt. 20-1 at ¶ 28). The City Council ultimately did not approve removing Burch as the Public Works Director and instructed Mayor England and Burch to continue working together. (Dkt. 20-1 at ¶ 33).

Following the City Council meeting, Mayor England continued to exclude Burch at work, oftentimes going directly to Burch's subordinates to discuss matters concerning public works. (Dkt. 19-3, Ex. A at 129:18-134:8). Mayor England also removed some of Burch's work responsibilities. For example, Mayor England removed Burch from conducting a leadership training, which Burch had helped to develop and had led in prior years. (Dkt. 19-3, Ex. A at 134:9-135:21). Regarding Burch's removal from the leadership training, Mayor England told Gummersall he was concerned the training was a means to remove Mayor England from office. (Dkt. 20-7 at 11:16-18). As a result of these changes, Burch's workload shrank to less than a full-time position by March 2022. (Dkt. 19-3, Ex. A at 140:24-141:2). On March 3, 2022, Burch submitted to Mayor England his resignation as Public Works Director, effective April 8. (Dkt. 20-1 at ¶ 57). On April 7, Burch provided a letter "to Human Resources" explaining--among other things--that he was resigning because of Mayor England's alleged retaliation against him for "exercising [his] right to vote for another candidate." (Dkt. 20-8).

On August 23, 2022, Burch initiated this lawsuit against the City and Mayor England. (Dkt. 1). His complaint alleges they retaliated against him for (1) advocating that the City change

---

[4]     Under the City's municipal code, the mayor can only remove appointed officers with the City Council's approval. *See* City Code of Chubbuck, Idaho § 2.10.010(B); Idaho Code § 50-206.

its organizational structure to hire a city administrator and (2) supporting Mayor England's opponent, Heiner, in the 2021 Chubbuck mayoral election. The complaint asserts two causes of action: a First Amendment retaliation claim under § 1983 and a state-law claim for violation of the Idaho Protection of Public Employees Act (IPPEA), Idaho Code §§ 6-2101 through 6-2109. Following discovery, Defendants moved for summary judgment. (Dkt. 19).

## II.  LEGAL STANDARD

Summary judgment is appropriate where a party can show that, as to any claim or defense, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those that may affect the outcome of the case, and a dispute about a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). The mere existence of a scintilla of evidence is insufficient. *Id.* at 252. Rather, "there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Id.*

In deciding whether a genuine dispute of material fact exists, the court must view the facts in the light most favorable to the nonmoving party. *Id.* at 255; *Devereaux v. Abbey*, 263 F.3d 1070, 1074 (9th Cir. 2001) ("Viewing the evidence in the light most favorable to the nonmoving party, we must determine whether there any genuine issues of material fact and whether the district court correctly applied the relevant substantive law.") (citing *Lopez v. Smith*, 203 F.3d 1122, 1131 (9th Cir. 2000)). The court is prohibited from weighing the evidence or resolving disputed issues in the moving party's favor. *See Tolan v. Cotton*, 572 U.S. 650, 657 (2014).

Under Rule 56(c)(1)(A), the nonmoving party asserting a fact is genuinely disputed must support that assertion by particularly citing to materials in the record. The opposing party, however, may object to the cited material if it "cannot be presented in a form that would be

admissible in evidence." Fed. R. Civ. P. 56(c)(2). That a court may only consider admissible evidence in ruling on a summary judgment motion is well established. *Beyene v. Coleman Sec. Servs., Inc.*, 854 F.2d 1179, 1181-82 (9th Cir. 1988).

## III.  ANALYSIS

Defendants move for summary judgment on both of Burch's claims under § 1983 and IPPEA. Defendants also move to strike certain deposition testimony of City Councilor Evans, arguing it is inadmissible hearsay. (Dkt. 21). Because the Court grants Defendants' summary judgment motion for the reasons discussed below, it denies the motion to strike as moot.

### A.        Section 1983 Claim - First Amendment Retaliation

That "public employees do not surrender all their First Amendment rights by reason of their employment" is well established. "Rather, the First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern." *Garcetti v Ceballos*, 547 U.S. 410, 417 (2006). For this reason, "the state may not abuse its position as employer to stifle the First Amendment rights its employees would otherwise enjoy as citizens to comment on matters of public interest." *Eng v. Cooley*, 552 F.3d 1062, 1070 (9th Cir. 2009) (cleaned up). An employer's retaliation in response to an employee's protected speech is actionable under § 1983.

To establish a prima facie First Amendment retaliation claim, the plaintiff must prove: (1) he engaged in protected speech; (2) the defendant took an adverse employment action against him; and (3) the protected speech was a substantial or motivating factor for the adverse employment action. *Dodge v. Evergreen Sch. Dist. #114*, 56 F.4th 767, 776 (9th Cir. 2022). "If the plaintiff establishes a prima facie case, 'the burdens of evidence and persuasion . . . shift to the Defendants to show that the balance of interests justified their adverse employment decision.'" *Id.*

(quoting *Eng*, 552 F.3d at 1074). Additionally, the employer can avoid liability by showing it would have taken the same adverse employment actions against the employee even in the absence of the employee's protected speech. *See Eng*, 552 F.3d at 1072 (citation omitted).

Here, Burch alleges Mayor England violated his First Amendment rights by retaliating against him in response to his protected speech.[5] Burch suggests the following instances of his speech are protected under the First Amendment: (1) his communications with Mayor England proposing a city administrator position, (2) his communications with City Council members regarding his city administrator proposal, and (3) his yard sign in support of Heiner's mayoral candidacy. As a result of this protected speech, Burch contends Mayor England took several adverse employment actions against him, including asking him to resign, requesting the City Council remove him as Public Works Director, and limiting his workload. Burch also alleges he was constructively discharged. In their summary judgment motion, Defendants argue that these allegations do not satisfy the prima facie elements of a retaliation claim and that, even if they did, Burch's criticisms of Mayor England provided a nonpretextual and legitimate interest in taking adverse action against Burch.[6]

The Court concludes Burch has failed to present sufficient evidence to establish a prima facie retaliation claim under § 1983. As discussed below, Burch's communications regarding his

---

[5]    Many of Burch's allegations and arguments focus on Mayor England's conduct. For Burch to prove the City is liable under § 1983, he must establish that "action pursuant to official municipal policy" caused his injury. *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 691 (1978). Official municipal policy includes the decisions of a local government's policymaking officials, such as a mayor. *Connick v. Thompson*, 563 U.S. 51 (2011). In other words, if Mayor England's conduct is actionable, the City is liable for that conduct.

[6]    Defendants have also argued Burch's political speech is not protected under the policymaker exception to the First Amendment. *See Fazio v. City & Cnty. of San Francisco*, 125 F.3d 1328, 1332 (9th Cir. 1997) (citing *Elrod v. Burns*, 427 U.S. 347 (1976)); *Branti v. Finkel*, 445 U.S. 507, 518 (1980)). The Court does not need to address this issue, however, because Burch fails to establish a prima facie retaliation claim even assuming he is not a policymaker.

advocacy for a city administrator position are not protected speech because they were spoken in his capacity as a public employee rather than as a private citizen. Additionally, there is insufficient evidence to conclude Burch's yard sign supporting Heiner for mayor (or Burch's general support for Heiner otherwise) was a substantial or motivating factor in any adverse action taken by Mayor England. Finally, Burch's criticism of Mayor England provided a nonpretextual explanation for Mayor England's conduct, and Burch has failed to show Mayor England's explanation that he distrusted Burch was a pretext for Mayor England's actions.

### 1. Protected Speech

"Whether a public employee . . . has engaged in speech protected by the First Amendment breaks down to two inquiries: (1) whether he 'spoke on a matter of public concern,' and (2) whether he 'spoke as a private citizen or public employee.'" *Dodge*, 56 F.4th at 777 (citing *Johnson v. Poway Unified Sch. Dist.*, 658 F.3d 954, 961 (9th Cir. 2011)). Here, the speech at issue is: (1) Burch's communications with Mayor England and the City Council about hiring a city administrator; and (2) Burch's yard sign endorsing Mayor England's mayoral opponent, Heiner.[7]

#### a. *Matter of Public Concern*

Whether speech relates to a matter of public concern is a question of law. *See Eng*, 552 F.3d at 1070. "Speech involves a matter of public concern when it can fairly be considered to relate to any matter of political, social, or other concern to the community." *Id.* (citation omitted). Communications regarding the functioning of government generally qualify as speech relating to a matter of public concern. *See id.* at 1072. Here, the Court concludes Burch's communications regarding the city administrator position and his yard sign pertained to matters of public concern.

---

[7] The Court also considers that Burch otherwise generally endorsed Heiner, although he attests his support was "primarily" limited to "putting a sign on [his] front lawn." (Dkt. 20-13 at ¶ 18).

MEMORANDUM DECISION AND ORDER - 10

Burch's yard sign was a public expression of support for a candidate in a local election. Such speech implicates a matter of public concern because it is inherently political and relevant to a community matter. Likewise, Burch's communications regarding the city administrator proposal involved a matter of public concern because they related to the functioning and structure of the City's government. Specifically, the proposal recommended altering the mayor's job responsibilities; was considered in a special meeting by the City Council; and involved a matter affecting politics and the community at large.

> b.   *Private Citizen or Public Employee*

Whether Burch's speech about these public concerns—the mayoral election and the structure of City government—is protected depends on whether he spoke regarding these matters as a private citizen or in his capacity as a public official. "Speech made by public employees in their official capacity is not insulated from employer discipline by the First Amendment, but speech made in their private capacity as a citizen is." *Brandon v. Maricopa Cnty.*, 849 F.3d 837, 843 (9th Cir. 2017) (citing *Garcetti*, 547 U.S. at 421). "Statements are made in the speaker's capacity as citizen if the speaker had no official duty to make the questioned statements, or if the speech was not the product of performing the tasks the employee was paid to perform." *Eng*, 552 F.3d at 1071 (citation omitted). The ultimate determination of whether speech is spoken as a private citizen or as a public employee is a question of law, but determining the scope of the employee's job responsibilities is a question of fact. *Id.*

To determine whether an employee's speech fell within his job duties, the Ninth Circuit identifies three factors in *Dahlia v. Rodriguez*, 735 F.3d 1060, 1074-76 (9th Cir. 2013) (en banc), for consideration: (1) whether the employee confined his communication to his chain of command; (2) the subject matter of the communication; and (3) whether the public employee spoke in direct contravention of his supervisor's orders. An employee's formal job description is not dispositive

of whether an employee's speech was within the scope of his job responsibilities because "[f]ormal job descriptions often bear little resemblance to the duties an employee actually is expected to perform[.]" *Garcetti*, 547 U.S. at 424-25.

Here, the Court concludes Burch's yard sign supporting Heiner was expressed in Burch's capacity as a private citizen, and Defendants do not argue otherwise. The Court concludes, however, that Burch's communications regarding the city administrator proposal were made in his capacity as a public employee under the *Dahlia* factors. First, nothing in the record shows Burch did not confine his communications regarding the proposal to his chain of command. *See Dahlia*, 735 F.3d at 1074 (citation omitted) ("When a public employee communicates with individuals or entities outside of his chain of command, it is unlikely that he is speaking pursuant to his duties."). Rather, the record shows Burch spoke with Mayor England, members of City Council, and the HR Director, Gummersall, about the proposal.

Both Mayor England and the City Council were undisputedly in Burch's chain of command. According to Burch's job description he performed his work under the Mayor's and the City Council's general direction. (Dkt. 19-4 at p. 20). *See also* City Code of Chubbuck, Idaho § 2.10.010 (providing for Mayor and City Council's removal). Further, although Gummersall was not Burch's supervisor or subordinate, Burch worked with Gummersall to develop a job description for a city administrator. (Dkt. 20-13 at ¶ 5). That Burch worked with the HR Director to develop a city administrator job description indicates not that he was proposing the position as a private citizen, but rather that he was working in his capacity as a City employee with another City employee whose responsibility it was to develop job descriptions.

Second, the record shows the subject matter of Burch's city administrator proposal was within his responsibilities as a City employee. *See Dahlia*, 735 F.3d at 1074-75 (considering

subject matter of communication). Burch's job duties undisputedly included strategic planning. As Burch states, "[i]n 2018, he spearheaded the creation of a Strategic Plan for the city," which he attests included obtaining public input for the Plan, creating the Plan, presenting the Plan to the City Council, and obtaining approval for the Plan. (Dkt. 20-1 at p. 4; Dkt. 20-13 at ¶ 13). Further, Burch attests Mayor England let the Plan fall "to the wayside" and Burch's subsequent proposal was to have a city administrator "oversee the entire city operation as a whole to ensure the goals in the Strategic Plan were being met." (Dkt. 20-13 at ¶¶ 13-14). Burch specifically acknowledges the impetus for his advocacy to alter the City's organizational structure was Mayor England's purported mismanagement of the Strategic Plan, the City's credit program, and the mayor's approach to budgeting. (*Id.* at ¶ 12). That Burch's job description did not specifically identify strategic planning as a duty is not dispositive of the actual role he played within the City's government. *See Garcetti*, 547 U.S. at 424-25 (noting job description may bear little resemblance to actual duties performed). Rather, the record shows Burch's performance of strategic planning duties flowed from his role as a high-level City employee and not as a private citizen.

Finally, the record shows Burch's advocacy for a city administrator did not contravene his superiors' orders. *See Dahlia*, 735 F.3d at 1075 ("[W]hen a public employee speaks in direct contravention to his supervisor's orders, that speech may often fall outside of the speaker's professional duties."). According to Burch, the City Council supported his idea to add a city administrator, and Mayor England initially did as well. Burch also provided his June 1 memorandum to Mayor England at the mayor's request, and when Mayor England later asked Burch to stop advocating for a city administrator proposal, Burch complied. (Dkt. 19-4 at p. 12) ("Mayor England changed his mind and indicated he did not support the idea and asked us to stop promoting it. At that time, I stopped advocating for the change and went back to business as

normal."). No evidence shows Burch disobeyed his superior's orders by advocating for a city administrator.

In summary, the *Dahlia* factors indicate Burch spoke in his capacity as a public employee rather than as a private citizen when advocating for a city administrator. Accordingly, the First Amendment does not protect Burch's communications about the city administrator proposal, and those communications cannot support his retaliation claim.

### 2. Substantial or Motivating Factor for Adverse Employment Actions

Because only Burch's yard sign constituted protected speech, the Court must consider whether the yard sign was a substantial or motivating factor for any alleged adverse employment action Burch suffered. The second and third elements of a retaliation claim require the plaintiff to show the employer "took adverse employment action . . . and that the speech was a substantial or motivating factor in the adverse action." *See Eng*, 552 F.3d at 1071 (cleaned up); *Dodge*, 56 F.4th at 778, 781. Whether a plaintiff has made such a showing is a question of fact. *See Eng*, 552 F.3d at 1071. Here, Burch has alleged Mayor England took adverse action against him in response to his speech when Mayor England (1) asked him to resign, (2) requested the City Council remove him as Public Works Director, (3) limited his workload, and (4) constructively terminated him.

As a preliminary matter, the Court concludes the record does not support Burch's claim the City constructively discharged him. Unlike other adverse employment actions, constructive discharge generally requires proving an employee's "working conditions [had] become so intolerable that a reasonable person in the employee's position would have felt compelled to resign." *Green v. Brennan*, 578 U.S. 547, 555 (2016) (quoting *Pa. State Police v. Suders*, 542 U.S. 129, 141 (2004)). Working conditions are intolerable if they are "sufficiently extraordinary and egregious to overcome the normal motivation of a competent, diligent, and reasonable employee to remain on the job to earn a livelihood and to serve his or her employer." *Poland v. Chertoff*, 494

F.3d 1174, 1184 (9th Cir. 2007) (quoting *Brooks v. City of San Mateo*, 229 F.3d 917, 930 (9th Cir. 2000)); *see also Waterman Nationwide Mut. Ins. Co.*, 201 P.3d 640, 645 (Idaho 2009) ("The inquiry is objective: Did working conditions become so intolerable that a reasonable person in the employee's position would have felt compelled to resign?") (quoting *Poland*, 494 F.3d at 1184).

This standard is exacting. "[E]vidence of transfer and demotion is insufficient, as a matter of law, to establish a constructive discharge." *Poland*, 494 F.3d at 1184. Likewise, an employee is not constructively discharged merely because his "managerial responsibilities were reduced." *Huskey v. City of San Jose*, 204 F.3d 893, 901 (9th Cir. 2000). For this reason, although constructive discharge is generally a question of fact determined under the totality of the circumstances, courts may resolve the issue as a matter of law if the plaintiff fails to present facts sufficient to show the situation was so "extraordinary and egregious to overcome the normal motivation of a competent, diligent, and reasonable employee to remain on the job." *Swirski v. ProTec Bldg. Servs.*, No: 3:20-cv-01321-LAB-MDD, 2021 WL 5771222, at *5 (S.D. Cal. Dec. 6, 2021) (quoting *Poland*, 494 F.3d at 1184).

Here, Burch argues the City constructively discharged him because his "enforced idleness had become so intolerable that his resignation was a fitting response" and because he "remained responsible for matters outside his control . . . he could not, in good conscience, remain." (Dkt. 20 at pp. 2, 4). In support, he relies on *Parrett v. City of Connersville, Indiana*, 737 F.2d 690 (7th Cir. 1984). In that case, Parrett was "chief of detectives" who investigated a forgery implicating Cordes' daughter and had "an angry exchange" with Cordes regarding the matter. *Id.* at 692-93. Later, Cordes was appointed city attorney, a position with authority over the police department, including Parrett. *Id.* at 693. Upon becoming the city attorney, Cordes asked Parrett to resign, and when Parrett refused, "Cordes made no secret of the fact that he was 'going to get [Parrett]' because

of the way Parrett had investigated the charges involving Cordes' daughter." *Id.* Thereafter, Parrett was "removed as chief of detectives and transferred to the uniformed force as 'line captain'"; was not "assigned any police duties as 'line captain'"; was "given a windowless room to sit in that formerly had been a storage closet"; and "spent his shift sitting at the desk with nothing to do." *Id.* Defendants' treatment of Parrett caused him to suffer "symptoms of nervous collapse [including] cardiac abnormalities"—a fact found by the jury after Parrett sued defendants for violating § 1983. *Id.* On appeal from the jury verdict for Parrett, the Seventh Circuit concluded "the jury was entitled to find that the hospitalization and medical treatment were consequences of the measures that the defendants had taken to make Parrett's life at work intolerable." *Id.* at 694.

Other than Mayor England asking Burch to resign, Burch's case does not resemble *Parrett*. Unlike *Parrett*, Burch's working conditions were not so intolerable as to make him physically ill; Mayor England never verbally expressed any intent to "get" Burch because he supported another mayoral candidate; and Burch was not relegated to a closet without any responsibilities. Indeed, by Burch's own admission, his work duties at the time of his resignation remained near full time. (Dkt. 19-3, Ex. A at 140:24-141:2). *See Huskey*, 204 F.3d at 901 (ruling employee is not constructively discharged merely because his "managerial responsibilities were reduced").

Rather than asserting his working conditions were intolerable, Burch acknowledges his own "conscience" was the reason for his resignation. (Dkt. 20 at p. 4). For example, he attests, "I was not ready to give up my position as the public works director. However, I could not stay and be responsible for decisions, including financial decisions, being made without my knowledge." (Dkt. 20-13 at ¶ 30). No evidence supports, however, that Burch would be responsible for any decisions others made or that he would ultimately be excluded from the final budgeting process for his department. Based on this record, the Court concludes no reasonable jury would conclude

Burch's working conditions had become so intolerable that a reasonable person in his position would have felt compelled to resign.

Having concluded Defendants did not constructively discharge Burch, the Court considers the remaining adverse employment actions Burch alleges, which include that Mayor England asked him to resign, requested City Council remove him as Public Works Director, and limited his workload. Assuming these actions were adverse, the Court concludes the evidence is insufficient to establish a causal connection between these actions and Burch's yard sign. To establish a causal connection between the protected speech and adverse action, "[i]t is not enough to show that an official acted with a retaliatory motive and that the plaintiff was injured—the motive must cause the injury." *Nieves v. Bartlett*, 139 S. Ct. 1715, 1722 (2019) (citation omitted). An employee may make this showing using either direct or circumstantial evidence. *See Ulrich v. City & Cnty. of San Francisco*, 308 F.3d 968, 979 (9th Cir. 2002). Examples of circumstantial evidence include: "[1] a proximity in time between the protected speech and the adverse action, [2] the defendant's expression of opposition to the protected speech, and [3] evidence that the defendant proffered false or pretextual explanations for the adverse action." *Boquist v. Courtney*, 32 F.4th 764, 777 (9th Cir. 2022) (citation omitted).

Considering these factors, the Court concludes no reasonable jury could find Burch's yard sign caused Mayor England's adverse actions. Although Mayor England's requests that Burch resign and that the City Council discharge him were proximate in time to the November 2021 election results, Burch admits Mayor England "became cool towards" him months earlier in June or July 2021 after Burch directly criticized Mayor England's performance in numerous respects. (Dkt. 20-13 at ¶ 17). At this time, Burch admits Mayor England "started cutting [him] out of meetings and decisions." (*Id.*) The record indicates Mayor England's conduct followed Burch's

criticism of him, not Burch's support for Heiner. Further, Mayor England never expressed any opposition to Burch's support for Heiner. In fact, that Mayor England never discussed with Burch his yard sign or his support for Heiner otherwise is undisputed. (Dkt. 19-3, Ex. A at 99:25-100:7, Ex. B at 24:24-25:1).

Finally, even if Burch could establish a prima facie retaliation claim based on his support for Heiner, Mayor England has established that "the balance of interests" justified his actions and that he would have taken the same actions even if Burch had not supported Heiner for mayor. *See Eng*, 552 F.3d at 1072, 1074 (stating shifting burden for defendant). In June 2021, Burch seriously criticized Mayor England's performance in numerous respects. (Dkt. 19-4 at pp. 7-8) (setting forth Burch's "specific comments"). Furthermore, Burch did so in a manner suggesting he had also been soliciting criticism of Mayor England from the City's staff. (*See id.* at p. 9) (identifying criticisms from "general staff"). Mayor England testified he considered Burch's June 1, 2021 memo criticizing him to be a form of insubordination and "cause for [Burch's] removal." (Dkt. 19-3, Ex. B at 78:25-79:9). Gummersall also testified Mayor England had lost trust in Burch based on how Burch handled the city administrator proposal. (Dkt. 20-7 at 10:4-24, 11:8-18). Further, Burch acknowledges his conduct had caused a rumor he was "trying to form a coup and take over the leadership of the city." (Dkt. 19-3, Ex. A at 190:2-13; Dkt. 20-13 at ¶ 17). Based on this evidence, the Court concludes Mayor England has met his burden of showing a nonpretextual reason justifying his actions against Burch.

In sum, the Court concludes Burch's communications regarding the city administrator proposal are not protected speech under the First Amendment. Although Burch's yard sign (and his general support for Heiner) is protected speech, no reasonable juror could find that speech caused Mayor England's alleged adverse actions, which were justified based on Burch's serious

criticisms of Mayor England. Accordingly, the Court grants summary judgment on Burch's First Amendment retaliation claim in Defendants' favor.

**B.      Claim for Violation of the Idaho Protection of Public Employees Act**

Burch also alleges Defendants violated the IPPEA, also known as the Whistleblower Act. *See Eller v. Idaho State Police*, 443 P.3d 161, 167 (Idaho 2019) (referring to IPPEA as "Whistleblower Act"). IPPEA's purpose is to "protect the integrity of government by providing a legal cause of action for public employees who experience adverse action from their employer as a result of reporting waste and violations of a law, rule or regulation." *Id.* at 62-63 (quoting Idaho Code § 6-2101). To establish a prima facie claim under the IPPEA, a plaintiff must show: "(1) he was an employee who engaged or intended to engage in protected activity; (2) his employer took adverse action against him; and (3) the existence of a causal connection between the protected activity and the employer's adverse action." *Van v. Portneuf Med. Cntr.*, 330 P.3d 1054, 1059 (Idaho 2014) (internal citation and quotation omitted). If a plaintiff establishes the prima facie elements of an IPPEA claim, the burden shifts to the employer to produce evidence it discharged or took another adverse action against the plaintiff for a legitimate, nonretaliatory reason. *Cryer v. Idaho Dep't of Labor*, 332 F. Supp. 3d 1260, 1271 (D. Idaho 2018) (citation omitted) (applying *McDonnell Douglas* burden-shifting analysis to retaliation claims under the IPPEA). "If the employer meets this burden, the burden then shifts back to the plaintiff to prove that the legitimate non-discriminatory reason the employer proffered is, in fact, a pretext." *Id.* (citation omitted).

Here, Burch argues his advocacy for a city administrator position was a protected activity under IPPEA because that advocacy involved communications about the City's waste of public funds and manpower. Because of these communications, Burch contends Mayor England took adverse action against him including: (1) asking him to resign, (2) requesting the City Council

remove him as Public Works Director, (3) limiting and reassigning several of his job duties, and (4) constructively terminating him. Burch's IPPEA claim fails for two, alternative reasons. First, the claim is untimely because Burch did not file it within the statute of limitations. Second, Burch failed to establish he engaged in a protected activity under the Act.

### 1.  Statute of Limitations

An employee who alleges an IPPEA violation must commence an action within "one hundred eighty (180) days after the occurrence of the alleged violation." Idaho Code § 6-2105(2). An IPPEA violation occurs when an employer takes an "adverse action" against an employee for IPPEA protected conduct. *See* Idaho Code § 6-2104. A lawsuit is commenced in federal court when the complaint is filed. *See* Fed. R. Civ. P. 3. Burch filed his complaint in this case on August 23, 2022. Accordingly, IPPEA's statute of limitations bars a challenge to any adverse action Defendants took against Burch before February 24, 2022—i.e., 180 days before Burch filed this action.

No evidence in the record supports the conclusion that Defendants took any adverse action against Burch after February 23, 2022. Although Mayor England asked Burch to resign and attempted to have the City Council discharge him, those actions occurred in November 2021, which is outside the 180-day statute of limitations. Further, although Mayor England limited and reassigned some of Burch's work duties beginning in 2021, no evidence supports these actions occurred at any time after February 23, 2022. Finally, although Burch resigned in April 2022, he has failed to establish (or even allege) that he resigned because his working conditions had become intolerable, and as a result, his resignation was not a constructive discharge, as discussed above. Accordingly, Burch's resignation was not an adverse action occurring within 180 days before he commenced this action. Because Burch did not commence this lawsuit within 180 days of any of the alleged adverse actions, Burch's claim is untimely.

MEMORANDUM DECISION AND ORDER - 20

### 2.  Protected Activity

Moreover, the Court questions whether Burch's efforts to create a city administrator position constituted "waste" within the meaning of the IPPEA. The IPPEA protects an employee who "communicates in good faith the existence of any waste of public funds, property or manpower, or a violation or suspected violation of a law, rule or regulation . . . ." Idaho Code § 6-2104(1)(a); *see also Cryer*, 332 F. Supp. 3d at 1271-72 (citing Idaho Code §§ 6-2104(1), 6-2104(3)). The IPPEA does not expressly define "waste" for purposes of the statute. Case law addressing § 6-2104, however, suggests the phrase "waste of public funds, property or manpower" refers to the misuse or misallocation of government assets. *See Cryer*, 332 F. Supp. 3d at 1275 (finding "hiring unqualified candidates, needlessly duplicating or creating new positions, improperly awarding bonuses, and making hiring and firing decisions based on personal relationships could each constitute waste of public funds and manpower"); *Curlee v. Kootenai Cnty. Fire & Rescue*, 224 P.3d 458, 460 (Idaho 2008) (concluding employee who was discharged for documenting coworker's waste stated prima facie case under IPPEA).

Here, Burch argues he engaged in a protected activity under the IPPEA when he communicated his concerns underlying his advocacy for the city administrator position. Burch describes those concerns as Mayor England's mismanagement of the Strategic Plan, Mayor England's approach to budgeting, and the decision to offer a discount under the City's credit program. (Dkt. 20-13 at ¶¶ 13-15). While these concerns involve how the City and Mayor England managed government assets—and may even have merit—they do not reasonably allege Defendants misused public assets in an illegal, unethical, or inappropriate manner. Rather, Burch's concerns are more aptly described as a policy disagreement rather than a waste of public funds, property, or manpower.

For this reason, the Court disagrees Burch's concerns about Mayor England's alleged poor performance or the City's purported inefficiencies constitute communications about "waste" under § 6-2104. To conclude otherwise would transform any policy disagreement regarding the proper use of public assets between an elected official and an employee who communicates their disagreement into a protected activity under the IPPEA. Because Burch's concerns do not directly relate to waste but rather to a policy and professional disagreement, the Court concludes Burch has failed to establish his communications identified the existence of "any waste of public funds, property or manpower" and were, thus, not protected under the IPPEA. Accordingly, the Court grants Defendants' summary judgment motion on Burch's IPPEA claim.

## IV.  ORDER

**IT IS ORDERED that:**

1.      Defendants' Motion for Summary Judgment (Dkt. 19) is **GRANTED**.

2.      Defendants' Motion to Strike (Dkt. 21) is **DENIED as moot**.

3.      The Court will enter judgment in favor of Defendants in a separate document. *See* Fed. R. Civ. P. 58.

DATED: May 10, 2024

Amanda K. Brailsford
U.S. District Court Judge